# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL MARZETTE, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) Case No. 1:20-cv-05119 |
| v. | ) ) |
| SP PLUS CORPORATION, a Delaware corporation | ) ) ) |
| Defendants. | ) ) |

<u>**DECLARATION OF BRETT HARVEY**</u>

Pursuant to 28 U.S.C. § 1746, Brett Harvey declares and states as follows:

1.      I have personal knowledge of the matters set forth in this declaration and would be competent to testify thereto at a trial or hearing in this matter.

2.      I am Vice President Employee/Labor Relations at SP Plus Corporation ("SP Plus"). SP Plus is company that, among other services, provides parking management services. My duties include overseeing and administering workplace issues, such as time and attendance policies and collective bargaining agreements (CBAs) between SP Plus Corporation and the Teamsters Local Union No. 727 ("Local 727").

3.      I have reviewed SP Plus's business and employment records, which it maintains in the ordinary course of its business. I am also familiar with SP Plus's corporate history.

4.      I have reviewed the class action complaint in the matter titled *Marzette v. SP Plus Corporation*, Case No. 2020-CH-03691 (Circuit Court of Cook County), which I understand is being removed to federal court. The complaint and summons that were served on SP Plus are attached hereto as Exhibit 1. SP Plus was served with the complaint and summons on July 30, 2020. (Ex. 2.)

5.     Based on my review of SP Plus's records, Plaintiff Michael Marzette was employed with SP Plus, which was previously known as Standard Parking Corporation, from approximately August 8, 2002 to November 21, 2016, first as a hiker and customer service employee and then later as cashier and customer service employee at Chicago Midway Airport. Plaintiff Marzette was a member of Local 727 for the entire duration of his employment with SP Plus.

6.     The most recent collective bargaining agreement between SP Plus and Local 727, which governed the terms and conditions of Plaintiff Marzette's employment is effective from November 1, 2016 to October 31 2021, attached hereto as Exhibit. 3. Prior to that CBA, SP Plus and Local 727 had a collective bargaining agreement which also governed the terms and conditions of Plaintiff's Marzette's employment, which was effective from November 1, 2011 to October 31, 2016, attached hereto as Exhibit. 4.

7.     Both collective bargaining agreements (Ex. 3 and 4) were originally entered into between Local 727 and SP Plus's predecessor, which was named Standard Parking Corporation f/k/a Standard Parking. In 2013, Standard Parking Corporation changed its name to SP Plus Corporation,[1] and SP Plus Corporation agreed to stand in its place with regard to the collective bargaining agreements with Local 727. After Standard Parking Corporation changed its name to SP Plus Corporation, SP Plus, Local 727 and the members of Local 727 treated SP Plus as the employer under the CBA.

---

[1] Specifically, SP Plus Corporation's 2013 10-K states: "Effective December 2, 2013, Standard Parking Corporation changed its name to SP Plus Corporation. The name change was effected through a short-form merger pursuant to Section 253 of the Delaware General Corporation Law (the ''DGCL'') by merging a newly formed wholly owned subsidiary of the Company into the Company, with the Company remaining as the surviving corporation in the merger. Under the DGCL, the merger did not require stockholder approval and had the sole effect of amending our certificate of incorporation to reflect our new legal name." *See* SEC filings, SP Plus Corporation, Annual Report (Form 10-K) (March 13, 2013), p. 3.

8.      The collective bargaining agreements provide that Local 727 is the sole collective bargaining agent for Local 727 members. (Ex. 3 at § 1.1; Ex. 4 at § 1.1.) The agreements state that they cover various employee classifications, including cashiers and customer service employees (Ex. 3 at § 1.1; Ex. 4 at § 1.1.), include a Management Rights section (Ex. 3 at § 21.1; Ex. 4 at § 21.1.), and a grievance procedure that culminates in arbitration (Ex. 3 §§ 6.1-6.3; Ex. 4 §§ 6.1-6.3).  The Collective Bargaining Agreements also require SP Plus to keep accurate time records. (Ex. 3 at § 23.1; Ex. 4 at § 23.1).

9.      When SP Plus began using the timeclock referenced in Marzette's Complaint, it did so pursuant to the Management Rights clause in Section 21.1 and consistent with Section 23.1 of the Collective Bargaining Agreements (Ex. 3 and 4).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2020

_____
Brett Harvey

# EXHIBIT 1

Return Date: No return date scheduled
Hearing Date: 8/3/2020 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

FILED
4/3/2020 1:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH03691

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| **MICHAEL MARZETTE,** individually, and on behalf of all others similarly situated, | Case No. 2020CH03691  9016515 |
| *Plaintiff*, | **CLASS ACTION COMPLAINT** |
| *v.* | **DEMAND FOR JURY TRIAL** |
| **SP PLUS CORPORATION,** a Delaware corporation, | |
| *Defendant*. | |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Marzette ("Marzette" or "Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendant SP Plus Corporation ("SP Plus" or "Defendant") for violating the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.* Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**INTRODUCTION**

1.       SP Plus is a corporation that claims to facilitate the efficient movement of people, vehicles and personal belongings with the goal of enhancing the consumer experience while improving bottom line results for its clients.[1] SP Plus provides parking facility management

---

[1] https://www.spplus.com

1

FILED DATE: 4/3/2020 1:36 PM    2020CH03691

services in the United States and Canada. Additionally, the Company provides management services at multi-level and surface parking facilities in the urban and airport parking markets.[2]

2.     SP Plus employs over ten-thousand full-time employees. Plaintiff brings this class action to put an end to SP Plus's invasions of privacy – specifically its collection, storage, and subsequent use of its employees' fingerprint data without consent as required by BIPA.

3.     According to BIPA, "biometric information" is any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. "Biometric identifier" is defined as a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry.

4.     Biometric identification has become a common place in financial services, work environments, and everyday life such as unlocking a phone with a fingerprint or facial scan. With the rise of biometric scanning for personal information and data, Illinois enacted BIPA to protect consumers from companies using and abusing their personal biometric data.

5.     Due to the rise of biometric-facilitated transactions in Illinois, the State enacted BIPA. According to BIPA, "biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identify theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c).

6.     To protect consumer and employee privacy rights in the face of increased biometric-facilitated transactions, BIPA created a set of requirements that companies must

---

[2] https://www.bloomberg.com/profile/company/SP:US

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

adhere to *prior* to obtaining, storing, or using the biometric data in anyway. These requirements ban any use of biometric data unless the company first: (1) informs that person in writing that biometric information will be collected or stored; (2) informs that person in writing of the specific purpose and length of term for which such biometric information is being collected, stored and used; and (3) receives a written release from the person for the collection of his or her biometric information. 740 ILCS 14/15(b).

7.     Defendant used fingerprint activated timeclocks for employees to clock in and out of work. Plaintiff and Defendant's other employees were required to sign in and out using this fingerprint system. Plaintiff further alleges, that at no time during his employment he had ever authorized the collection and storage of his fingerprints for company use. Furthermore, Defendant does not provide its employees with a publicly available retention schedule or guidelines for permanently destroying their biometric information as expressly required by BIPA. 740 ILCS 14/15, *et seq.*

8.     Plaintiff brings this action individually and on behalf of proposed class in order to stop Defendant SP Plus's repeated violations of BIPA and to recover statutory damages for the unauthorized collection, storage, and use of their biometric information in violation of the BIPA.

**PARTIES**

9.     Plaintiff Michael Marzette is a resident of Bellwood, Cook County, Illinois.

10.     Defendant SP Plus is a Delaware corporation headquartered in Chicago, Cook County, Illinois. Defendant conducts business throughout this District.

**JURISDICTION AND VENUE**

3

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

11.     The Court has jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)(1) because Defendant does and is registered to do business in this state and Plaintiff is a resident of Illinois.

12.     Venue is proper in this Court because Defendant is headquartered in and does business throughout Cook County, Illinois.

## COMMON ALLEGATIONS

**Biometric Information and the Illinois BIPA**

13.     As previously mentioned, a "biometric identifier" is any biological, personal feature that includes fingerprints, iris scans, DNA, facial features and voice, as well as others.[3]

14.     Under BIPA consumers' and citizens' privacy in regard to biometric information deserves enhanced protections in the face of certain technological advances. BIPA recognizes that "biometrics are unlike other unique identifiers that are used to access finance or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transaction." *Id*.

15.     To protect consumer privacy, BIPA that states:

No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

---

[3] BIPA defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. "Biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. 740 ILCS 14/10. For the purposes of ease, biometric "information" and "identifier" may be used interchangeably for the remainder

4

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

(1) **informs** the subject of the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

(2) **informs** the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a **written release** executed by the subject of the biometric identifier or biometric information or the subject's legal authorized representative.

740 ILCS 14/15(b).

16.     BIPA also requires companies adopt a retention schedule for biometric information, stating:

> A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a)

17.     Defendant has engaged and continues to engage in the practice of collecting, storing, and using its employees' biometric information without any informed written consent in violation of all three requirements of Section 15(b). Additionally, in violation of Section 15(a), SP Plus has failed to provide a publicly available written policy regarding its schedule and guidelines for retention and permanent destruction of its users' biometric information.

### SP Plus Collects and Stores Current and Former Employees' Biometric Information Without Informed Consent

18.     SP Plus employs a large workforce that includes over 14,700 full-time employees and 9,200 part-time employees.

5

FILED DATE: 4/3/2020 1:36 PM    2020CH03691

19.     Defendant tracks its employees hours to ensure that it's paying employees who are signing in and out themselves (and not having co-workers clock them in and out). Using technology that relies on and captures biometric data helps to ensure honesty when clocking-in and out of the business.

20.     While this is an effective way to save money for the corporation and shareholders, when done incorrectly it adversely effects the Plaintiff and alleged Class. Reckless storage of biometric data can result in the biometric information being stolen and used against the employees.

21.     In violation of BIPA, however, Defendant collects, stores, and uses its employees' biometric information without any express written consent and without providing a public retention schedule.

22.     Both of these actions violate BIPA. In violation of the first requirement under Section 15(b) of BIPA, SP Plus never expressly informed or informs its employees that it would collect, store, or use their biometric fingerprint information.

23.     Second, and again in violation of Section 15(b) of BIPA, SP Plus never informed its employees of the specified purpose or length for which their fingerprints would be collected, stored, and used. The only knowledge employees were given was the installation of the biometric fingerprint timeclock that they were instructed to use.

24.     Finally, in another violation of Section 15(b) of BIPA, SP Plus never received any written release from its members before it began to collect, store, and use their biometric information. Employees of SP Plus were merely shown the biometric fingerprinting timeclock and told to use it to clock-in and out. Employees were never told of the potential ramifications of

6

FILED DATE: 4/3/2020 1:36 PM    2020CH03691

the fingerprinting timeclock, including, how the data would be stored, how long it would be stored, and if they were *required* to use the timeclock. By all accounts, the use of the biometric timeclock was mandatory for employees, despite its collection of extremely valuable and personal information.

25.     Defendant SP Plus's intentional, reckless, or negligent failure to provide employees with: (i) the BIPA-required written notice that their biometric information would be collected, stored, and used; (ii) information regarding the specific time and purpose for which such biometric information would be stored; and (iii) to obtain its employee's express written release for the collection, storage, and use of their biometric information, all violated BIPA.

**SP Plus Fails to Provide a Publicly Available Written Policy Regarding the Retention and Destruction of Biometric Information**

26.     Defendant also violated Section 15(a) of BIPA's requirement to "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information." 740 ILCS 14/15(a).

**FACTS SPECIFIC TO PLAINTIFF MICHAEL MARZETTE**

27.     Plaintiff Michael Marzette resides in Bellwood, Cook County, Illinois.

28.     Mr. Marzette began employment with Defendant SP Plus Corporation on or around August 8, 2002. Mr. Marzette was given the employee number 166018 by Defendant and worked at Midway Airport in Chicago, Illinois. He remained employed with Defendant until October 29, 2017.

29.     Mr. Marzette was employed as a hiker or customer service worker during his first two years with Defendant. For his remaining years, Mr. Marzette worked as a cashier and customer service employee.

7

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

30.     According to Mr. Marzette, Defendant began using the biometric fingerprint timeclock system around the end of 2015. At no point during the remainder of Mr. Marzette's employment with Defendant did Defendant ever provide any of the statutorily-required authorizations or disclosures to Plaintiff, nor did Defendant ever obtain consent under BIPA to collect such information.

31.     Plaintiff's only knowledge of the fingerprinting timeclock was the installation and required use to continue his employment with Defendant.

32.     Plaintiff never provided any form of informed consent, in writing or otherwise, to Defendant allowing Defendant's collection, storage, and usage of his biometric information in the form of fingerprints.

33.     Finally, Plaintiff was never made aware of, and still cannot find, any publicly available retention schedule provided by Defendant for the retention and deletion of employees' biometric data.

## CLASS ACTION ALLEGATIONS

**Class Treatment Is Appropriate for Plaintiff's BIPA Claims Arising From Collected, Stored, Captured, Or Used Biometric Data By Defendant SP Plus Corporation**

34.     Plaintiff brings this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

> **<u>Stored Biometric Data Class:</u>** All persons who, while residing in Illinois and employed by SP Plus Corporation, had their fingerprints collected, captured, stored, or otherwise used by SP Plus Corporation.

35.     Subject to additional information gathered through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

36.     The following individuals are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released. Plaintiff anticipates the need to amend the Class definitions following appropriate discovery.

37.     **Numerosity**: The exact size of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable due to the sheer size of Defendant's corporation and number of employees that may have been subjected to the collection of their biometric data. On information and belief, Defendant collected employee's biometric information in the form of fingerprints on its fingerprinting timeclock. Members of the Class can be identified through Defendant's employment records, and additional Members can be identified through discovering the extent that Defendant uses biometric scanners and timeclocks at each of their several locations throughout Illinois.

38.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

> (a)  whether Defendant collected, captured, received, or otherwise obtained biometric identifiers or biometric information from Plaintiff and the Class;

9

FILED DATE: 4/3/2020 1:36 PM    2020CH03691

(b) whether Defendant informed Plaintiff and the Class before collecting, using, and storing their biometric identifiers or biometric information as required by Section 15(b) of the BIPA;

(c) whether Defendant informed Plaintiff and the Class of the specific purpose and the length for which a biometric identifier or biometric information is being collected, stored, and used as required by Section 15(b) of the BIPA;

(d) whether Defendant obtained a written release, as defined by the BIPA, from the Plaintiff and the Class to collect, store, and use their biometric identifiers or biometric information;

(e) whether Defendant used biometric identifiers to identify Plaintiff and the Class;

(f) whether Defendant provided a publicly available written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometrics information, as required by Section 15(a) of the BIPA;

(g) whether Defendant's violations of BIPA were committed intentionally, recklessly, or negligently;

(h) whether Plaintiff and the Class are entitled to statutory damages under the BIPA and the correct measure for those damages; and

(i) whether Plaintiff and the Class are entitled to declaratory and injunctive relief.

39. **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class in that defendant collected, stored and used his biometric information without informed consent in the exact same manner as every other Class member.

40. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

41.     **Appropriateness**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class and as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Class uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Additionally, the damages suffered by individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Class to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
**Violations of Illinois Biometric Information Privacy Act, 40 ILCS 14/15(b)**
**(On Behalf of Plaintiff and the Class)**

42.     Plaintiff realleges and incorporates by reference the allegations contained in the aforementioned paragraphs of this Complaint and incorporates them by reference herein.

43.     Section 15(b) of BIPA states that a private entity may not, among other things,

> collect, capture, purchase, receive through trade, or otherwise obtain a person's or a consumer's biometric identifiers or biometric information, unless it first:

11

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

> (1)     informs the subject… in writing that a biometric identifier or biometric information is being collected or stored;
> (2)     informs the subject… in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
> (3)     receives a written release executed by the subject of the biometric identifier or biometric information…

740 ILCS 14/15(b).

44.    SP Plus Corporation is a private entity under BIPA.  *See* 740 ILCS 14/10.

45.    Plaintiff and the Class members are individuals under BIPA. *See id.*

46.    SP Plus Corporation collected, captured, and obtained Plaintiff's and the Class members' biometric identifiers through its biometric fingerprinting timeclocks.

47.    Plaintiff's and the Class members' fingerprints collected, captured, and obtained by Defendant are by definition "biometric information" as per BIPA because Defendant used those biometric identifiers to identify Plaintiff and Class members for the purposes of clocking in and out as employees of Defendant. *See id.*

48.    Defendant collected, captured, obtained, used, and stored Plaintiff's and the Class members' biometric information and identifiers without first obtaining the written release required by Section 15(b) of BIPA.

49.    As alleged and shown above, Defendant did not inform Plaintiff or the Class members in writing that their biometric identifiers or information were being collected, stored, and used as required by Section 15(b) of BIPA.

50.    As alleged and shown above, Defendant did not inform Plaintiff or the Class members in writing of the specific purpose and length for which their fingerprints or other information was being collected, stored, and used, as required by Section 15(b) of BIPA.

12

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

51.     Defendant is liable for violations under BIPA by collecting, capturing, obtaining, storing, and using Plaintiff's and the Class members' biometric identifiers and information as described herein, SP Plus Corporation violated Plaintiff's and the Class members' rights to privacy in their biometric identifiers or information as plainly stated within BIPA, 740 ILCS 14/1 *et seq.*

52.     SP Plus Corporation's violations of Section 15(b) of BIPA were intentional and reckless because SP Plus is headquartered, employs hundreds of employees within Illinois, and is actively counseled by attorneys familiar with Illinois law. BIPA has been law in Illinois since 2008, so SP Plus has had ample opportunity to follow the law as required, and intentionally chose not to do so.

53.     Alternatively, SP Plus's violations of Section 15(b) of BIPA were negligent because SP Plus failed to meet any applicable standard of care in ensuring that its members were informed and consented to the collection, storage, and use of their biometric information and biometric identifiers.

54.     As a result of defendant's violations of §15(b) of the BIPA, plaintiff seeks the following relief individually and on behalf of the Class: (l) injunctive and equitable relief pursuant to 740 ILCS 14/20(4) requiring Defendant to comply with the BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as alleged herein; (2) statutory damages of $5,000 for each intentional or reckless violation of the BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000 per negligent violation of the BIPA pursuant to 740 ILCS 14/20(1); and (3) reasonable attorneys' fees and costs expenses pursuant to 740 ILCS 14/20(3).

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

**SECOND CAUSE OF ACTION**
**Violations of the Illinois Biometric Information Privacy Act**
**740 ILCS 14/15(a)**
**(On Behalf of Plaintiff and the Class)**

55.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

56.     Section 15(a) of BIPA requires:

A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first.

740 ILCS 14/15(a).

57.     Defendant has failed to provide any sort of publicly available retention schedule or guidelines for permanently destroying its users' biometric identifiers and biometric information as required by BIPA. Consequently, Defendant has violated Section 15(a) of BIPA. As previously stated, this cause of action results in Defendant's violations of Section 15(a) of the BIPA to be seen as intentional or reckless, or in the alternative, negligent.

58.     As a result of Defendant's repeated violations of Section 15(a) of BIPA, plaintiff seeks he following relief individually and on behalf of the Class: (l) injunctive and equitable relief pursuant to 740 ILCS 14/20(4) requiring SP Plus to comply with §15(a) of the BIPA's requirement to establish and provide a publicly available retention schedule or guidelines for permanently destroying its users' biometric identifiers and biometric information; (2) statutory damages of $5,000 for each intentional or reckless violation of §15(a) of the BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000 per negligent violation of

14

§15(a) of the BIPA pursuant to 740 ILCS 14/20(1); and (3) reasonable attorneys' fees and costs expenses pursuant to 740 ILCS 14/20(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

a) An order certifying the Class as defined above; appointing Plaintiff as the representative of the Class; and appointing Woodrow & Peluso, LLC as Class Counsel;

b) An award of statutory damages of $5,000 for each intentional or reckless violation of the BIPA pursuant to 740 ILCS 14/20(2), or alternatively, statutory damages of $1,000 per negligent violation of the BIPA pursuant to 740 ILCS 14/20(1) to be paid into a common fund for the benefit of Plaintiff and the Class;

c) An order declaring that Defendant's actions, as set out above, violate BIPA, 740 ILCS 14/1, *et seq*;

d) An order awarding injunctive and equitable relief pursuant to 740 ILCS 14/20(4) requiring SP Plus Corporation to comply with the BIPA by providing a publicly available retention schedule or guidelines for permanently destroying its users' biometric identifiers and biometric information and forcing Defendant to stop collecting, storing, and using plaintiff's and the Class members' biometric identifiers and biometric information without first obtaining their informed written consent;

e) Awarding any further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff requests a jury trial.

15

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

FILED DATE: 4/3/2020 1:36 PM   2020CH03691

Dated: April 3, 2020

Respectfully submitted,

MICHAEL MARZETTE,

/s/ Marc E. McCallister
One of his attorneys

Marc E. McCallister
mem@mccallisterlawgroup.com
Gary D. McCallister
gdm@mccallisterlawgroup.com
McCallister Law Group
200 North LaSalle Street, Suite 2150
Chicago, IL 60601
Attorney No.: 59509
(312) 345-0611

Steven L. Woodrow
swoodrow@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 E. Mexico Avenue, Suite 300
Denver, Colorado 80210
Tel: 720-213-0675
Fax: 303-927-0809
*Attorneys for Plaintiff and the Class*

16

Return Date: No return date scheduled
Hearing Date: 8/3/2020 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
　　　　Cook County, IL

FILED
4/3/2020 1:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH03691

9016515

2120 - Served　　　　　　　　　2121 - Served
2220 - Not Served　　　　　　　2221 - Not Served
2320 - Served By Mail　　　　　　2321 - Served By Mail
2420 - Served By Publication　2421 - Served By Publication
Summons - Alias Summons　　　　　　　　　(08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MICHAEL MARZETTE

　　　　　　　　　(Name all parties)

v.

SP PLUS CORPORATION

Case No.

SP Plus Corporation
c/o Illinois Corporate Service Company
801 Adlai Stevenson Dr., Springfield, IL 62703

☑ **SUMMONS**　☐ **ALIAS SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**                                    **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions.  To e-file, you must first create an account with an e-filing service provider.  Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.  If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 59509

Atty Name: Marc E. McCallister

Atty. for: Plaintiff/Class Plaintiffs

Address: 200 N. LaSalle Street, Suite 2150

City: Chicago

State: IL     Zip: 60601

Telephone: (312) 345-0611

Primary Email: mem@mccallisterlawgroup.c

Witness: _____

4/3/2020 1:36 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 4/3/2020 1:36 PM  2020CH03691

**CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS**

FILED DATE: 4/3/2020 1:36 PM  2020CH03691

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

**Daley Center Divisions/Departments**

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

◉ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

# EXHIBIT 2

Return Date: No return date scheduled
Hearing Date: 8/3/2020 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
    Cook County, IL

Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/21/2020 12:25 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH03691

9833545

FILED
8/4/2020 11:32 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH03691

9987118

| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |

**Summons - Alias Summons** (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Michael Marzette, Individually and on behalf of
all other similarly situated,

(Name all parties)

v.

SP Plus Corporation, a Delaware Corporation

Case No. 2020 CH 03691

SP Plus Corporation
c/o Illinois Corporate Service Company
801 Adlai Stevenson Dr., Springfield, IL 62703

☐ **SUMMONS** ☒ **ALIAS SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons** **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 59509

Atty Name: Marc E. McCallister

Atty. for: Plaintiffs

Address: 200 N. LaSalle Street, Suite 2150

City: Chicago

State: IL    Zip: 60601

Telephone: (312) 345-0611

Primary Email: mem@mccallisterlawgroup.com

Witness: 7/21/2020 12:25 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS**

☐ Richard J Daley Center
50 W Washington
Chicago, IL 60602

☐ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

☐ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

☐ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

☐ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

**Daley Center Divisions/Departments**

☐ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☒ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

☐ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

FILED DATE: 7/24/2020 12:28 PM 2020CH03691

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**



# SANGAMON COUNTY SHERIFFS OFFICE
*"Keeping the Peace Since 1821"*

**JACK CAMPBELL**
#1 Sheriffs Plaza
Springfield, IL 62701

Administration - (217) 753-6855
Records - (217) 753-6846

Investigations - (217) 7...
Corrections - (217) 7...

FILED DATE: 8/4/2020 11:32 AM   2020CH03691

SG TRACKING #20- **3364**

I, ___Dep Smith___ certify that I served this summons as follows:

☐ Personal service on an individual, by leaving a copy of the summons and complaint with the defendant personally

☐ Abode service on an individual, by leaving a copy of the summons and complaint with a member of the household thirteen (13) years or older, informing said person of the contents thereof, and also by sending a copy of the summons, in a sealed envelope, postage paid, to the individual listed in the summons.

☒ Corporation service, by leaving a copy of the summons and complaint with an agent or officer of the corporation listed in the summons.

☐ Other service, as described below.

Case Number ___2020 CH 03691___

Name of defendant ___SP PLUS Corporation___

Name of other person
Summons left with ___Carl Lueschen___

Sex: ( M / F )  Race: ___W___  Approx. Age: ___

Date of Service ___7-30___ /2020  Time ___10:30___

Date of Mailing ___

Address at which paper was served:
___801 Atlai Stevenson Dr.___
___Spfld IL___

Service fees (Circle One) **$50.00 or $100.00**

Circle One: PAID    PAUPER    NO CHARGE

Jack Campbell, Sheriff of Sangamon County Sheriffs Office

By ___Smith___, Deputy # ___4973___

## IN PARTNERSHIP WITH THE COMMUNITY

# EXHIBIT 3

# TEAMSTERS LOCAL UNION NO. 727



## Standard Parking Corporation

### NOVEMBER 1, 2016 – OCTOBER 31, 2021

## ARTICLES OF AGREEMENT

**AGREEMENT made and entered into by and   Standard Parking Corporation   ** (hereinafter referred to as the "Employer"), and AUTO LIVERY CHAUFFEURS, EMBALMERS, FUNERAL DIRECTORS, APPRENTICES, AMBULANCE DRIVERS AND HELPERS, TAXICAB DRIVERS, MISCELLANEOUS GARAGE EMPLOYEES, CAR WASHERS, GREASERS, POLISHERS AND WASH RACK ATTENDANTS UNION, MOTION PICTURE, THEATRICAL, EXPOSITION, CONVENTION AND TRADE SHOW EMPLOYEES, PHARMACISTS, BUS DRIVERS, PARKING LOT ATTENDANTS, AND HIKERS, HOTEL INDUSTRY AND RACETRACK INDUSTRY EMPLOYEES NEWSPAPER MAGAZINE, PERIODICAL SALESMEN, DRIVERS DIVISION MEN DISTRICT MANAGERS CHECKERS VENDORS AND HANDLERS, AND ELECTRONIC MEDIA WORKERS, CHICAGO AND VICINITY, ILLINOIS LOCAL 727, an affiliate of the I.B. of T. (hereinafter referred to as the "Union"). It is understood that this Agreement also applies to Apartment Building Owners and Managers Association ("ABOMA") and is made and entered into by ABOMA on behalf of such of its member buildings as are listed on Schedule A which ABOMA has presented to the Union and that each of the members of ABOMA as now are or may hereafter become parties hereto is the Employer.

## ARTICLE 1
## RECOGNITION

1.1     It is agreed that the Union shall be the sole and exclusive bargaining agent for all employees of the Employer, including, but not limited to: Cashiers, hikers, attendants, porters, maintenance men/custodians, drive men, washers, collectors, customer service representatives (excluding those who do sales and/or marketing), drivers, dispatchers, bellmen, doormen and supervisors who perform bargaining unit work, but excluding clerical employees, guards, professional employees and supervisors as defined in the National Labor Relations Act, who do not perform bargaining unit work.

1.2     The Employer agrees not to discriminate in any way against any members of the Union.

1.3     The Employer shall assign the work covered under this Agreement to employees covered by this Agreement as described in Article 1, Section 1.1 of this Agreement. Non-bargaining unit employees, including supervisors, shall not regularly perform bargaining unit work normally assigned to employees in job classifications covered by this Agreement; provided, however, that they may perform such work in emergencies or in the instruction and/or training of employees. Nothing in this Article shall be construed to limit the Employer's ability to subcontract out maintenance and construction projects.

1.4     Should a new classification arise, the parties agree to meet and negotiate terms and conditions of employment for such new classification.

## ARTICLE 2
## UNION SECURITY

2.1     It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, or pay fees in lieu thereof, and those who are not members on the date on which this Agreement is signed shall, on the thirty-first day following the date on which this Agreement is signed, become and remain members in good standing in the Union, or pay fees in lieu thereof. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which the Agreement is signed shall,

2

on the thirty-first day following the beginning of such employment, become and remain members in the Union, or pay fees in lieu thereof.

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction. Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this Agreement whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds. The Employer will forward the same to the Union by the employee's thirty first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

2.5     The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to Teamsters Local 727 Political Action Committee (PAC). The PAC shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from each paycheck of every month. The Employer shall transmit such deductions to the Union on a monthly basis, not later than ten (10) days after the last deduction of the month.

## ARTICLE 3
## UNIFORMS

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms and replace worn-out or damaged uniforms. The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

## ARTICLE 4
## SENIORITY

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union. Separate seniority lists shall be maintained for full-time and part-time employees and further separated by residential and commercial locations. Employees (voluntarily) changing from one seniority list to the other shall go to the bottom of that seniority list but retain their original seniority date. The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing employees' names and first date of employment.

Seniority is to prevail at all times, except that seniority shall not apply to bargaining unit supervisors nor to the selection of bargaining unit supervisors.

All seniority shall be considered on a classification basis for purposes of layoffs with three classifications: (1) hikers; (2) porters; and (3) all other employees. In case of layoffs, the last employee hired in a particular classification is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his or her seniority to replace an employee on the other seniority list. Seniority shall also apply to recalls, in that the last employee laid off in a particular classification, shall be the first to be recalled in respect to separately maintained seniority lists.

**4.2**   Seniority shall be broken for any one or more of the following reasons:

    (a)     Voluntarily quitting.

    (b)     Discharge for cause.

    (c)     Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

    (d)     Failure to return to work after expiration of leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

    (e)     Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

    (f)     Is laid off for a continuous period of more than six (6) months.

    (g)     Engages in other employment while on authorized leave of absence without the consent of the Employer.

**4.3**   The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer without resort to the grievance procedure. After one hundred twenty (120) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

## ARTICLE 5
## DISCIPLINE AND DISCHARGE

**5.1**   No employee who has completed his or her probationary period will be discharged or disciplined except for just cause, adhering to the principles of progressive discipline as outlined in Article 31, Section 31.3 and 31.4.

**5.2**   The Union shall have the right to investigate the reasons for any discharge or discipline of a non probationary employee and to protest the same through the grievance and arbitration procedure. The determination of whether an employee has completed his/her probationary period will be subject to the grievance and arbitration procedure.

**5.3**   An employee must be notified as soon as possible of any disciplinary action.

**5.4**   Warning notices (including suspensions) shall not remain in effect, nor be relied upon for the next step of progressive discipline, for more than one (1) year from date of said warning notice.

## ARTICLE 6
## GRIEVANCE PROCEDURE

**6.1**   Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

**6.2**   The following Grievance Procedure shall be followed in resolving said disputes:

STEP ONE: Grievant will meet with Union Representative and Facility Manager as outlined above.

STEP TWO: In failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the dispute may then be referred by the Union to arbitration as provided for in this Section. Demand for arbitration shall be made within forty-five (45) calendar days from the date of the Step 2 grievance meeting unless the parties mutually agree to extend said timeline.

In cases wherein the Employer is not an ABOMA member, the parties may agree to an expedited Grievance Panel in lieu of FMCS arbitration provided below. Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union, and shall endeavor to settle the dispute. The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation. If said Grievance Panel fails to resolve the dispute within thirty (30) business days after it is referred to the Grievance Panel, the dispute may be submitted by the Union to arbitration as outlined below in Section 6.3. The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

In the case of members of ABOMA only, the dispute shall be referred to a "Board of Arbitration". A written statement of the grievance to be arbitrated shall be furnished by the Union to the Employer and ABOMA setting forth in detail the grievance requiring arbitration. The "Board of Arbitration" shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by ABOMA and one (1) person selected by the Union, and shall endeavor to settle the dispute . The "Board of Arbitration" shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. If said "Board of Arbitration" fails to resolve the dispute within thirty (30) business days after it is referred to said Board, the matter may be submitted by the Union to arbitration as outlined below. The fees and expenses of the "Board of Arbitration" shall be divided equally between the Union and the Employer. Decisions decided under this subparagraph shall have no precedential effect and shall not be cited in arbitrations involving an Employer who is a member of the Chicago Parking Association.

6.3     Arbitration shall be by an arbitrator selected from a panel supplied by the Federal Mediation and Conciliation Service (FMCS), and his or her decision shall be final and binding upon both parties. The Union shall request a panel of seven (7) arbitrators who shall be members of the National Academy of Arbitrators ("NAA") located within the Chicagoland geographical region. The Employer shall have the first strike and the parties shall then alternate striking arbitrator names until one is chosen. The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding. All other expenses of the arbitration shall be assumed by the party incurring them. The arbitration hearing will not be transcribed except when the arbitrator may deem necessary. At the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

6.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

6.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

## ARTICLE 7
## STRIKES AND LOCKOUTS

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work and the Employer agrees there shall be no lock-out during the time of this Agreement.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs. In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

## ARTICLE 8
## WAGES

8.1     (a)     All employees covered by this Agreement shall receive contract anniversary wage increases over and above their present hourly wage rate. The Employer agrees to increase the total package for the compensation to be paid, for (i) all hours worked or paid for, in the form of additional hourly Wages (Article 8), (ii) additional hourly contributions to the Health & Welfare, Pension and/or Legal & Educational Assistance Fund (Article 20) as follows:

Effective November 1, 2016 ..............$ 1.44 per hour

Effective November 1, 2017 ..............$ 1.44 per hour

Effective November 1, 2018 ..............$ 1.42 per hour

Effective November 1, 2019 ..............$ 1.40 per hour

Effective November 1, 2020 ..............$ 1.40 per hour

(b)     The allocation of the annual increase required in Section 8.1 shall be determined by the Union. The Union shall notify the Employer of its determination of the allocation between Wages (Article 8) and additional contributions to the Health & Welfare, Pension and/or Legal & Educational Assistance Fund by September 1st each contract year. The maximum amounts that may be allocated to wages as determined by the Union on an annual basis are as follows:

November 1, 2016:     $0.75 per hour

November 1, 2017:     $0.75 per hour

| November 1, 2018: | $0.65 per hour |
|---|---|
| November 1, 2019: | $0.65 per hour |
| November 1, 2020: | $0.65 per hour |

The maximum amount which can be allocated to the Legal and Educational Fund each year may not exceed $0.15 per hour. The minimum amount that must be allocated to wages during the final year of the contract shall be $0.25 per hour.

**8.2**    The following longevity wage scale applies for work performed at COMMERCIAL LOCATIONS.

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2016** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

### COMMERCIAL WAGE RATES PER HOUR
### HIRED PRIOR TO NOVEMBER 1, 2016

| Effective | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|---|---|---|---|---|---|---|
| 11/1/2016 | $14.00 | $14.75 | $15.50 | $16.25 | $17.65 | $19.65 |
| 11/1/2017* | | | | | | |
| 11/1/2018* | | | | | | |
| 11/1/2019* | | | | | | |
| 11/1/2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Year Five of Employment: $1.40 per hour**

**Two dollar differential shall be maintained between last two columns. Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.**

\*   Contract anniversary increases shall be determined pursuant to Section 8.1, above.

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2016,** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

**COMMERCIAL WAGE RATES PER HOUR**
**HIRED ON OR AFTER NOVEMBER 1, 2016**

| | Start | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| 11/1/ 2016 | $12.75 | | | | | |
| 11/1/ 2017* | | | | | | |
| 11/1/ 2018* | | | | | | |
| 11/1/ 2019* | | | | | | |
| 11/1/ 2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.**

\*  Contract anniversary increases shall be determined pursuant to Section 8.1, above.

**8.3** The following longevity wage scale applies for work performed at **RESIDENTIAL LOCATIONS.**

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2016** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

### RESIDENTIAL WAGE RATES PER HOUR
### HIRED PRIOR TO NOVEMBER 1, 2016

| Effective | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|---|---|---|---|---|---|---|
| 11/1/2016 | $14.75 | $15.50 | $16.25 | $17.00 | $18.40 | $20.40 |
| 11/1/2017* | | | | | | |
| 11/1/2018* | | | | | | |
| 11/1/2019* | | | | | | |
| 11/1/2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises.

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Year Five of Employment: $1.40 per hour**

Two dollar differential shall be maintained between last two columns. Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.

\* Contract anniversary increases shall be determined pursuant to Section 8.1, above.

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2016**, shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

### RESIDENTIAL WAGE RATES PER HOUR
### HIRED ON OR AFTER NOVEMBER 1, 2016

| | Start | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| 11/1 /2016 | $13.50 | | | | | |
| 11/1 /2017* | | | | | | |
| 11/1 /2018* | | | | | | |
| 11/1 /2019* | | | | | | |
| 11/1 /2020* | | | | | | |

All Employees, including those making more than the above schedule, shall also receive the following longevity and anniversary raises:

**Year One of Employment: $1.25 per hour**

**Year Two of Employment: $0.75 per hour**

**Year Three of Employment: $0.75 per hour**

**Year Four of Employment: $0.75 per hour**

**Only Employees with exactly five years of seniority or less shall receive both longevity and contract increases each year.**

\* Contract anniversary increases shall be determined pursuant to Section 8.1, above.

8.4      In applying the above wage scales, employees shall automatically receive longevity and contract anniversary increases.

8.5      Employees functioning (1) in a cashier's capacity, (2) in primarily self-service parking surface lots, (3) as customer service representatives or (4) in ground transportation shall receive twenty-five cents ($.25) per hour over the above-schedules. If applicable, such employees shall also receive the premium set forth below in Section 8.6.

8.6      Bargaining unit supervisors employed at a residential facility, including all bargaining unit supervisors employed by members of ABOMA, shall receive thirty-six cents ($ .36) per hour over the above residential schedules (Section 8.3 above). If applicable, such employees shall also

receive the premium set forth in Section 8.5 above. Employer may remove the premium only if the employee is returned to his or her previous classification at the applicable contractual wage rate as if the employee had never been made a supervisor.

8.7    The Employer agrees for the purpose of determining the wage rate of its employees (see schedules above) to give credit to any employee the amount of continuous days, months, and years of service said employee acquired under collective bargaining agreements of the Union and said employees shall be paid as set forth above.

8.8    It is understood and agreed that the red-circle provisions in Sections 8.2 and 8.3 and section 27.1 shall incorporate and include any pay increase(s) granted to employees since October 31, 2011 regardless of the reason for the increase.

## ARTICLE 9
## HOLIDAYS

9.1    Regular full-time employees shall receive additional compensation for the eight (8) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay. Those employees who are scheduled and do work on any of these eight (8) holidays will receive their regular daily straight-time rate of pay in addition to time and one-half (1 ½) per hour for all hours actually worked on said eight (8) holidays. To be entitled to holiday pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work. An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to extenuating circumstances. For the purpose of holiday pay and overtime pay on holidays, the holidays listed below will be celebrated on the calendar days they fall on:

New Year's Day

Martin Luther King, Jr.'s Birthday

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

Employee's Birthday

9.2    A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday.

9.3    Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Holiday Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

## ARTICLE 10
## MILITARY SERVICE

10.1    Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Military Selective Service Law.

## ARTICLE 11
## JURY DUTY

11.1    Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

## ARTICLE 12
## SICK AND PERSONAL LEAVE

12.1    A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year at the employees normal rate of pay for their normal workday hours but not less than eight (8) hours pay. Effective November 1, 2020, all full time employees shall receive one (1) additional sick and/or personal day per year.

12.2    A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

Effective November 1, 2020, all part-time employees shall receive one (1) additional sick and/or personal day per year.

12.3    The employee shall give one week's notice to the Employer for days used for personal leave. The employee shall phone a designated phone number and, if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave. Sick and personal days shall be non-cumulative.

12.4    Sick and/or personal days shall be earned and taken on a calendar year basis. All employees who have completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days on January 1st of each year, to be used by December 31st of each year. All employees who have not completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days upon completion of six (6) months of employment, to be used by December 31st of that year. In the event that all of the employee's earned sick and/or personal days are not taken by December 31st, the Employer shall pay the employee the value of said sick and/or personal days.

12.5    Employees shall receive an accounting of all their accrued sick and personal days, no less frequently than monthly.

12.6    A sick or personal day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

12.7    The provisions of this Article are in lieu of the rights and benefits provided by the Cook County Earned Sick Leave Ordinance and the City of Chicago Paid Sick Leave Ordinance. The parties expressly agree that all rights and benefits under the Cook County Earned Sick Leave Ordinance and the City of Chicago Paid Sick Leave Ordinance are hereby waived.

## ARTICLE 13
## FUNERAL LEAVE

13.1    A regular full-time or regular part time employee who loses time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days. Part time employees will receive up to four (4) days of Funeral leave provided the employee is regularly scheduled at least four (4) days per week.  Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law or grandparents.

13.2    In order to qualify for funeral leave pay, the employee must have worked for the Employer for six (6) months or longer.

13.3    Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

13.4    Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving and settling the affairs of the deceased.

## ARTICLE 14
## VACATIONS

14.1    Employees shall receive vacation in accordance with the following schedule:

After one (1) year of employment, one (1) weeks vacation

After two (2) years of employment, two (2) weeks vacation

After five (5) years of employment, three (3) weeks vacation

After ten (10) years of employment, four (4) weeks vacation

After twenty-five (25) years of employment, five (5) weeks vacation

**14.2**

    (a)    A vacation bank shall be established for each employee. The Employer shall deposit the amount of all vacation time that is owed to the employee. In addition, employees shall begin to accrue vacation on a monthly basis in accordance with (b), which accrued vacation time shall be added to the employee's vacation bank.

    (b)    Vacations shall be earned on a monthly basis in accordance with the following schedule:

<u>After one (1) year of employment: .417 vacation days per month (equivalent to one (1) weeks vacation):</u>

Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 23rd month of employment), employees accrue .417 vacation days per month.

<u>After two (2) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):</u>

Beginning with the month in which the employee completes two (2) years of employment and continuing through the month prior to the month in which the employee completes five (5) years of employment (24th month through 59th month of employment), employees accrue .834 vacation days per month.

<u>After five (5) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation):</u>

Beginning with the month in which the employee completes five (5) years of employment and continuing through the month prior to the month in which the employee completes ten (10) years of employment (60th month through 119 month), employees accrue 1.25 vacation days per month.

<u>After ten (10) years of employment, 1.67 vacation days per month (equivalent to four (4) weeks vacation):</u>

Beginning with the month in which the employee completes ten (10) years of employment and continuing through the month prior to the month in which the employee completes twenty-five (25) years of employment (120th month through 299th month), employees accrue 1.67 vacation days per month.

<u>After twenty-five (25) years of employment, 2.084 vacation days per month (equivalent to five (5) weeks vacation):</u>

Beginning with the month in which the employee completes twenty-five (25) years of employment and continuing for each month thereafter (300th month and beyond), employees accrue 2.084 vacation days per month.

(c)      The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d)      Employees shall be entitled to use vacation time immediately after accruing.

(e)      Every December 1st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f)      Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

14.3    Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

14.4    Employees shall be paid their earned vacation pay prior to the time they leave on vacation.

14.5    Preference by seniority shall be given to an employee's choice of vacation period.

14.6    Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (vacation, personal days, holidays, sick days, funeral leave pay) shall be considered as hours worked in determining compensation. Employees shall also accrue vacation while on Workers' Compensation.

14.7    Vacation checks shall be issued separately.

14.8    A vacation day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

## ARTICLE 15
## LEAVE OF ABSENCE

15.1    The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

(a)      The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

(b)      The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

(c)      Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2    The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3    The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law.

15.4 In all cases of medical leave, regardless of whether the leave is a FMLA leave, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5 Upon expiration of an authorized medical or family or medical leave, an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

## ARTICLE 16
## HOURS OF WORK

16.1 Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2 Part-time employees covered by this Agreement who are called to work shall receive not less than four (4) hours work or its equivalent per day.

16.3 There shall be no split shift assignments for employees within a twenty-four (24) hour period covered by this Agreement.

16.4 Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause. However, an employee before leaving the Employer's premises shall be required to punch out.

16.5 All regular full-time employees covered by this Agreement shall be guaranteed a workweek consisting of forty (40) hours exclusive of one-half (1/2) hour for a lunch period each day. Said workweek shall contain two (2) consecutive days off where possible for the Employer to so operate. For employees employed at residential locations only, time and one-half (1 ½) shall be paid for all hours worked over eight (8) hours daily. For all employees, time and one- half (1 ½) shall be paid for all hours worked over forty (40) hours in any one (1) week exclusive of the thirty (30) minute lunch period each day. Overtime shall not be paid twice for the same hours worked.

16.6 If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act and at least thirty (30) minutes shall be allowed each day without pay for employees' lunch period.

16.7 When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.

## ARTICLE 17
## LIMITATIONS ON PART TIME EMPLOYEES

17.1 No Employer shall have more than forty-two percent (42%) of total employees covered under this Agreement as part time employees.

## ARTICLE 18
## TRANSFERS

18.1 Transfers may not be made except for good cause subject to recourse through the grievance procedure or by agreement between the Employer and the Union. In emergency situations,

however, an employee may be required to work at a different location for one (1) day. In the event an employee is transferred to a new location which requires a drug test the employee will have the option to refuse the drug test and shall be subject to layoff should his seniority warrant layoff. If the employee submits to the drug test and the test is positive, the employee will be subject to the terms and conditions of the drug testing policy.

## ARTICLE 19
## DRIVER'S LICENSE

19.1    All employees shall continuously have and shall exhibit to the Employer upon request an unrestricted State Driver's License if necessary to perform his or her job. Any employee found not to have same in his or her possession will be suspended for up to thirty (30) days until a valid license is presented. After that time, the employee may be subject to termination. The Employer has the right to run MVR checks and terminate/not hire based only upon lack of valid license.

## ARTICLE 20
## HEALTH AND WELFARE, PENSION AND LEGAL AND EDUCATIONAL ASSISTANCE

20.1    Health and Welfare

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 ...........................................$1,059.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Health and Welfare Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1 , 2016.........................................$6.10 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)    Contributions due hereunder to the Health and Welfare Fund for all employees hired on or after November 1, 2016, shall commence with the month in which their employment begins.

20.2    Pension

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Pension fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 .........................................$385.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Pension Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2016 ...........................................$2.20 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c) Contributions due hereunder to the Pension Fund for all employees shall commence with the month succeeding that month in which employment begins; provided, however, that contributions to the Pension Fund on account of newly hired employees shall commence with their thirteenth (13th) month of employment. For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Pension Fund within the six (6) months prior to hire.

**20.3**  Legal and Educational Assistance

(a) The Employer shall contribute to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2016 ...........................................$112.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b) The Employer shall contribute monthly to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2016 ...........................................$ 0.65 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c) Contributions due hereunder to the Legal and Educational Assistance Fund for all employees shall commence with the month in which employment begins.

**20.4**  The contribution rates payable to the Health and Welfare, Pension and Legal and Educational Assistance Funds pursuant to Sections 20.1, 20.2 and 20.3 above shall be increased as follows:

(a) It is agreed that the Employer shall contribute additional amounts over and above those required in Sections 20.1(a), 20.2(a) and 20.3(a) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds, combined, on behalf of each full time employee as follows:

Effective 3/1/2017.............$119.60 per month
Effective 3/1/2018............$TBD Per Sec. 8.1
Effective 3/1/2019............$TBD Per Sec. 8.1
Effective 3/1/2020............$TBD Per Sec. 8.1
Effective 3/1/2021............$TBD Per Sec. 8.1

(b) The distribution of the additional contributions required in (a) above to the Health and Welfare, Pension, and/or Legal and Educational Assistance Funds shall be left to the decision of the Board of Trustees of the respective Funds.

(c) It is further agreed that the Employer shall contribute an equivalent additional hourly amount over and above those required in Sections 20.1(b), 20.2(b) and 20.3(b) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds on behalf of part time employees.

20.5 For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who works one hundred twenty eight(128) hours or more in a calendar month shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

20.6 Part time per hour contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds are due only up to the amount of the applicable full time contribution.

20.7 No contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds shall be required on behalf of any employee who is on a leave of absence, except as required by law.

20.8 By the execution of this Agreement, each Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

20.9 It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare, Pension or Legal and Educational Assistance Funds created under this Agreement; in accordance with the rules and regulations of the Trustees of such Funds, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

20.10 Should the Trustees of the Health and Welfare, Pension or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed three (3) years from the date of notice of audit.

## ARTICLE 21
## MANAGEMENT RIGHTS

21.1 All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement.

## ARTICLE 22
## DOCTORS' EXAMINATIONS

22.1 All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

19

## ARTICLE 23
## TIME RECORDS

23.1    The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

## ARTICLE 24
## ACCESS TO FACILITY

24.1    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's working schedule.

## ARTICLE 25
## SHIFT CHANGES

25.1    If the Employer has legitimate cause, it may change shifts provided that it provides employees with the required advance notice. Employees must receive seven (7) days notice of a shift change.

## ARTICLE 26
## PAYDAY

26.1    Payday shall be at least as often as biweekly (every two weeks). Employees must receive a paper or electronic paycheck; an Employer is prohibited from paying an employee in cash.

## ARTICLE 27
## MAINTENANCE OF BENEFITS

27.1    Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement or during the term of this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 28
## INDIVIDUAL AGREEMENTS

28.1    There shall be no side deals or individual agreements whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
## NON-DISCRIMINATION

29.1    It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, membership or non-membership in the Union, or any protected category.

# ARTICLE 30
## PENSION – UNFUNDED LIABILITY

30.1 Upon the request in writing from any Employer signatory hereto, addressed to the Benefit Funds, the Benefit Funds shall be required to furnish such Employer an annual statement for the most recent period available on the Employer's withdrawal liability, if any. It is agreed that such requests shall be limited to one (1) each year from each Employer.

# ARTICLE 31
## SHORTAGES

31.1 Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

31.2 Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred. Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

31.3 In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

### GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE TWELVE MONTH PERIOD | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

31.4 It is understood that the foregoing constitute agreed-upon disciplinary guidelines. However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review. Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

31.5 If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

## ARTICLE 32
## EMPLOYEE LIABILITY

**32.1**  Except as provided for in Article 31, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

**32.2**  No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

## ARTICLE 33
## CHANGE IN OWNERSHIP OR MANAGEMENT

**33.1**  In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice, on the form provided by the Union, prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss. At the time of location change, the former Employer shall pay out all wages and benefits owned under this Agreement, including accrued vacation, to all former employees, unless the former Employer operates a residential location with a "pass through" contractual provision.

**33.2**  Subject to the provisions herein, any employee who has continuously worked at a location for one hundred and eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. The Employer losing the location will be obligated to retain all other employees. Provided, however, that regardless of length at location, the Employer losing the location shall retain any employee who was previously terminated by the acquiring Employer, if such termination was upheld through the Grievance and Arbitration Procedure, or the Union decided not to pursue such termination through the Grievance and Arbitration Procedure. Full time Employees of the Employer losing the location who work less than 20 hours per week on average at the location being transitioned shall be retained by the Employer losing the location. Full time employees of the Employer losing the location who work 20 hours or more than per week on average at the location being transitioned shall be retained by the acquiring Employer and shall be provided with a full time schedule which can be created by laying off a part time employee employed elsewhere.

**33.3**  Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the value of all accrued vacation, accrued sick/personal days and compensation earned under this Agreement but not taken and/or paid. In addition, the Employer who lost the location shall pay the respective Benefit Funds any amounts owed. The acquiring Employer shall provide said employees with corresponding time-off without pay which the employee may use by December 31st. Upon commencing employment with the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

## ARTICLE 34
## CREDIT UNION

**34.1**  The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit. The

employee will notify the Employer by written authorization of the amount to be deducted and deposited. Such deduction will be on a biweekly basis and forwarded to the credit union.

## ARTICLE 35
## DRIVE AUTHORIZATION AND DEDUCTION

35.1    The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck on a biweekly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck.

## ARTICLE 36
## OPEN FULL-TIME POSITIONS

36.1    Any full-time positions that become open must be offered to part-time employees at that location as follows:

(a)    Only part time employees who work at the location in which the full time position is available must be offered the position.

(b)    These part time employees are to be offered the position in seniority order, starting with the part time employee with the most seniority.

(c)    Such seniority is not length of time at the location, but rather Union seniority, as defined in Article 4, Section 4.1.

## ARTICLE 37
## LABOR MANAGEMENT COMMITTEE

37.1    The Employer agrees to contribute four dollars ($4.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 38
## LOCATION/FACILITY CLASSIFICATION

38.1    The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to valet service locations. All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location/facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

(a)    Commercial: All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking spaces in the building where the location exists.

(b)    Residential: All locations of employer members of ABOMA and all other locations in which more than fifty percent (50%) of the vehicles parked at the location belong to residents of the property are residential locations.

(c)    Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

**38.2**    The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

**38.3**    Employees are permitted to work at multiple locations/facilities. While performing such work, employees shall be compensated for all hours worked at the location/facility under the Agreement covering that location/facility; provided, however, that where an Employer transfers an employee to another location/facility under the provisions of Article 18, such employee shall be paid the highest wage rate in effect under any of the Agreements the employee works under.

## ARTICLE 39
## TEAMSTERS-NATIONAL 401(K) SAVINGS PLAN

**39.1**    The Employer hereby agrees to participate in the Teamsters-National 401(k) Savings Plan ("the Plan") on behalf of all employees represented for purposes of collective bargaining under this Agreement. The Employer will make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. The Employer will forward withheld sums to the Plan at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust (the "Trust"). The Employer will execute a Participation Agreement with the Union and the Trustees of the Plan evidencing employer participation the Plan effective prior to any employee deferral being received by the Plan. In addition, the Employer agrees to require the payroll system provide separate paycheck deductions so that the Plan may allow participant loans. The Employer further agrees, at such times as it is administratively feasible, to require the payroll system to provide separate paycheck deductions so that the Plan may allow after-tax contributions.

## ARTICLE 40
## MISCELLANEOUS

**40.1**    Once employed, no employee shall be required to take a polygraph, behavioral analysis, background check or other similar test.

**40.2**    Employees, except for porters, may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers as well as office and employee restroom areas.

**40.3**    An employee may not be discharged or disciplined because his/her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

**40.4**    Past practices regarding car washing will prevail at each location, except that an agreement must be reached with the Union regarding the wages, hours, terms and conditions of employment for such work in any one of the following circumstances:

(a)    where the method of washing cars or the number of cars to be washed per shift or otherwise is to be substantially changed;

(b)    instituting car washing at any location where cars have not been washed during the past twelve (12) months; or

      (c)      instituting car washing at new garages.

40.5    Drug and alcohol testing will only be permitted for probationary employees and reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union. An Employer acquiring a location pursuant to Article 33 (Change in Ownership or Management) shall have the right to perform one (1) Drug and Alcohol or Background test pursuant to the existing policy and practices within the acquiring employer's first thirty (30) days of employing acquired employee. Under these circumstances, an acquired employee's refusal to submit to the Drug and Alcohol or Background test shall result in termination of employment. Positive test results from the Drug and Alcohol test under these circumstances shall be handled in accordance with the terms of the existing policy and practices.

40.6    An Employer acquiring an location pursuant to Article 33 (Change in Ownership or Management) may conduct a Background check and refuse to employ an individual whose Background check under such circumstances reports the conviction of a Class 3 (or more serious) Felony. If the background check results in the refusal to employ the employee, the former employer is under no obligation to retain the employee, provided that the former employer can establish just cause that it would not have otherwise retained the employee due to a violation of company policy to disclose a class 3 (or more serious) Felony.

40.7    On or after November 15, 2016, the Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests an exception to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union. Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

40.8    Members of ABOMA other than those listed in Schedule A who elect to adopt this Agreement shall notify ABOMA to that effect. Notice of election to adopt this Agreement shall be made by members of ABOMA in writing and ABOMA shall in turn notify the Union. Such notice shall state the name, and location of the building to which the election applies and the name of the Employer. If any building which is paying its employees who are covered by this Agreement wages higher than those provided in this Agreement shall desire to adopt this Agreement, it shall not reduce such higher wages during the term of this Agreement.

40.9    On the next scheduled pay period after separation of employment, an employee shall be paid all compensation owed including wages, accrued vacation days, and accrued sick/personal days, and applicable contributions will be made to the Teamsters Local 727 Health and Welfare, Pension and Legal and Educational Assistance Funds.

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors, and assigns.

THIS AGREEMENT shall be constructed as divisible as to each Employer and the failure of any Employer to abide by the terms hereof shall not operate to terminate this Agreement as to any other Employer. No breach of this Agreement by any Employer shall operate to subject ABOMA or another Employer to any legal liability to the Union.

THIS AGREEMENT shall go into effect November 1, 2016, and shall continue in full force and effect until and including October 31, 2021, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to October 31, 2021, or sixty (60) days prior to October 31 of any subsequent year. Employer agrees that the Chicago Parking Association or ABOMA (if it is a member of ABOMA) shall bargain any successor Agreement on the Employer's behalf unless Employer provides written notice otherwise to the Union, the Chicago Parking Association, and ABOMA as appropriate sent via certified mail sixty (60) days prior to October 31, 2021, or sixty (60) days prior to October 31 of any subsequent year should this Agreement be extended.

EXECUTED at Chicago, Illinois, this ____ day of _____, 201__.

FOR THE EMPLOYER

FOR THE UNION

26

### LETTER OF UNDERSTANDING #1

For River North Car Wash only, it is agreed that due to inclement weather or other business reasons, full-time employees may receive less than forty (40) hours a week. Such discretion shall not be exercised unreasonably by River North Car Wash, shall be subject to the grievance procedure outlined in Article 6 of the Collective Bargaining Agreement, and shall affect only employees whose job duties are to wash cars and other related duties.

EXECUTED at Chicago, Illinois, this ____ day of _____, 201___.

FOR THE EMPLOYER                                   FOR THE UNION

27

## LETTER OF UNDERSTANDING #2

This Letter of Understanding is entered into between Hotel Employers and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016.

The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first 3 months (January, February and March) of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1.      To be involuntarily furloughed for up to three (3) weeks(one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this 3 month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2.      To have a full time schedule reduced to 32 hours.

EXECUTED at Chicago, Illinois, this ____ day of _____, 201___.

FOR THE EMPLOYER                                    FOR THE UNION

_____                            _____

28

## LETTER OF UNDERSTANDING  #3

This Letter of Understanding is entered into between the Employer and Teamsters Local 727, and is hereby attached to and incorporated into the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016 ("the CBA").

Beginning with an Eligible Employee's (as defined herein) anniversary date, which occurs next following November 1, 2014, the parties agree that, in addition to the wage increases provided in Article 8 of the CBA, Employees who were hired between November 1, 2006 and October 31, 2011, ("Eligible Employees") will receive an additional increase of $0.30 per hour effective on their respective date of hire ("anniversary date") each year between November 1, 2014 through October 31,2020. The Eligible Employee shall receive a final increase under this Side Letter of Agreement  #3 of $0.20 in the next contract year (November 1, 2020 through October 31, 2021) An Eligible Employee shall accumulate wage increases under this Side Letter of Agreement  #3 totaling $2.00 per hour.  Employees hired between November 1, 2006 and October 31, 2011 who received a $2.00 increase during the period November 1, 2011 to April 6, 2015 or who are otherwise receiving the Top-Pay Scale, as described in Article 8 of the CBA are not eligible for increases under this Side Letter #3.

The wage increases required by this Side Letter #3 shall be retroactive to November 1, 3014 for only those Eligible Employees whose anniversary date occurred between November 1, 2014 and the date of execution of this Side Letter #3.  This Side Letter of Agreement shall survive the expiration of the CBA until the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder, unless, it is deleted through the collective bargaining process. Notwithstanding the foregoing, this Side Letter of Agreement #3, will cease to exist and will be deleted from any further Collective Bargaining Agreement upon the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder.

EXECUTED at Chicago, Illinois, this _____ day of _____, 201___.

FOR THE EMPLOYER

FOR THE UNION

29

# EXHIBIT 4

---

## AGREEMENT

---

dated

### NOVEMBER 1, 2011 - OCTOBER 31, 2016

by

### TEAMSTERS LOCAL UNION NO. 727
Union

and

### STANDARD PARKING
Employer

## ARTICLES OF AGREEMENT

**AGREEMENT made and entered into by and between Standard Parking** (hereinafter referred to as the "Employer"), and AUTO LIVERY CHAUFFEURS, EMBALMERS, FUNERAL DIRECTORS, APPRENTICES, AMBULANCE DRIVERS AND HELPERS, TAXICAB DRIVERS, MISCELLANEOUS GARAGE EMPLOYEES, CAR WASHERS, GREASERS, POLISHERS AND WASH RACK ATTENDANTS UNION, MOTION PICTURE, THEATRICAL, EXPOSITION, CONVENTION AND TRADE SHOW EMPLOYEES, PHARMACISTS, BUS DRIVERS, PARKING LOT ATTENDANTS, AND HIKERS, HOTEL INDUSTRY AND RACETRACK INDUSTRY EMPLOYEES CHICAGO AND VICINITY, ILLINOIS LOCAL 727, an affiliate of the I.B. of T. (hereinafter referred to as the "Union"). It is understood that this Agreement also applies to Apartment Building Owners and Managers Association ("ABOMA") and is made and entered into by ABOMA on behalf of such of its member buildings as are listed on Schedule A which ABOMA has presented to the Union and that each of the members of ABOMA as now are or may hereafter become parties hereto is the Employer.

## ARTICLE 1
## RECOGNITION

1.1    It is agreed that the Union shall be the sole and exclusive bargaining agent for all employees of the Employer, including, but not limited to: Cashiers, hikers, attendants, porters, maintenance men/custodians, drive men, washers, collectors, customer service representatives (excluding those who do sales and/or marketing), drivers, dispatchers, bellmen, doormen and supervisors who perform bargaining unit work, but excluding clerical employees, guards, professional employees and supervisors as defined in the National Labor Relations Act, who do not perform bargaining unit work.

1.2    The Employer agrees not to discriminate in any way against any members of the Union.

1.3    The Employer shall assign the work covered under this Agreement to employees covered by this Agreement as described in Article 1, Section 1.1 of this Agreement. Non-bargaining unit employees, including supervisors, shall not regularly perform bargaining unit work normally assigned to employees in job classifications covered by this Agreement; provided, however, that they may perform such work in emergencies or in the instruction and/or training of employees. Nothing in this Article shall be construed to limit the Employer's ability to subcontract out maintenance and construction projects.

1.4    Should a new classification arise, the parties agree to meet and negotiate terms and conditions of employment for such new classification.

## ARTICLE 2
## UNION SECURITY

2.1    It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, or pay fees in lieu thereof, and those who are not members on the date on which this Agreement is signed shall, on the thirty-first day following the date on which this Agreement is signed, become and remain members in good standing in the Union, or pay fees in lieu thereof. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which the Agreement is signed shall, on the thirty-first day following the beginning of such employment, become and remain members in the Union, or pay fees in lieu thereof.

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction. Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this understanding, whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds. The Employer will forward the same to the Union by the employee's thirty first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

2.5     The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to Teamsters Local 727 Political Action Committee (PAC). The PAC shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from each paycheck of every month. The Employer shall transmit such deductions to the Union on a monthly basis, not later than ten (10) days after the last deduction of the month.

**ARTICLE 3**
**UNIFORMS**

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms and replace worn-out or damaged uniforms. The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

**ARTICLE 4**
**SENIORITY**

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union. Separate seniority lists shall be maintained for full-time and part-time employees and further separated by residential and commercial locations. Employees (voluntarily) changing from one seniority list to the other shall go to the bottom of that seniority list but retain their original seniority date. The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing their names and first date of employment.

Seniority is to prevail at all times, except that seniority shall not apply to bargaining unit supervisors nor to the selection of bargaining unit supervisors.

All seniority shall be considered on a classification basis for purposes of layoffs with three classifications: (1) hikers; (2) porters; and (3) all other employees. In case of layoffs, the last employee hired in a particular classification is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his or her seniority to replace an employee on the other seniority list. Seniority shall also apply to recalls, in that the last employee laid off in a particular classification, shall be the first to be recalled in respect to separately maintained seniority lists.

4.2     Seniority shall be broken for any one or more of the following reasons:

(a)     Voluntarily quitting.

(b)    Discharge for cause.

(c)    Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

(d)    Failure to return to work after expiration of leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

(e)    Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

(f)    Is laid off for a continuous period of more than six (6) months.

(g)    Engages in other employment while on authorized leave of absence without the consent of the Employer.

**4.3**    The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer. After one hundred twenty (120) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

## ARTICLE 5
## DISCIPLINE AND DISCHARGE

**5.1**    No employee who has completed his or her probationary period will be discharged or disciplined except for just cause, adhering to the principles of progressive discipline as outlined in Article 31, Section 31.3.

**5.2**    The Union shall have the right to investigate the reasons for any discharge or discipline and to protest the same through the grievance and arbitration procedure.

**5.3**    An employee must be notified as soon as possible of any disciplinary action.

**5.4**    Warning notices (including suspensions) shall not remain in effect, nor be relied upon for the next step of progressive discipline, for more than one (1) year from date of said warning notice.

## ARTICLE 6
## GRIEVANCE PROCEDURE

**6.1**    Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

**6.2**    The following Grievance Procedure shall be followed in resolving said disputes:

STEP ONE: Grievant will meet with Union Representative and Facility Manager as outlined above.

STEP TWO: In failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the issue may then be referred by the Union to arbitration as provided for in this Section. Demand for arbitration shall be made within forty-five (45) calendar days from the date of the Step 2 grievance meeting unless the parties mutually agree to extend said timeline.

In lieu of FMCS arbitration provided for in Section 6.3, below, the parties may agree to an expedited Grievance Panel in cases where the Employer is not an ABOMA member. Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union, and shall endeavor to settle the matter. The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation. If said Grievance Panel fails to resolve the matter within thirty (30) business days after it is referred to the Grievance Panel, the matter may be submitted by the Union to arbitration as outlined below in Section 6.3. The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

In the case of members of ABOMA only, the matter shall be referred to a "Board of Arbitration". A written statement of the grievance to be arbitrated shall be furnished by the Union to the Employer and ABOMA setting forth in detail the grievance requiring arbitration. The "Board of Arbitration" shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by ABOMA and one (1) person selected by the Union, and shall endeavor to settle the matter. The "Board of Arbitration" shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting. If said "Board of Arbitration" fails to resolve the matter within thirty (30) business days after it is referred to said Board, the matter may be submitted by the Union to arbitration as outlined below. The fees and expenses of the "Board of Arbitration" shall be divided equally between the Union and the Employer.

6.3     Arbitration shall be by an arbitrator from the Federal Mediation and Conciliation Service (FMCS), and his or her decision shall be final and binding upon both parties. The Union shall request a panel of seven (7) arbitrators from the National Academy of Arbitrators ("NAA") within the Chicagoland geographical region. The Employer shall have the first strike and the parties shall then alternate striking arbitrator names until one is chosen. The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding. All other expenses of the arbitration shall be assumed by the party incurring them. The arbitration hearing will not be transcribed except when the arbitrator may deem necessary. At the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

6.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

6.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

## ARTICLE 7
## STRIKES AND LOCKOUTS

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work and the Employer agrees there shall be no lock-out during the time of this understanding.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs. In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

**ARTICLE 8**
**WAGES**

8.1     All employees covered by this Agreement shall receive contract anniversary wage increases over and above their present hourly wage rate as follows:

> Effective November 1, 2011 ..............$ 0.55 per hour
>
> Effective November 1, 2012 ..............$ 0.55 per hour
>
> Effective November 1, 2013 ..............$ 0.55 per hour
>
> Effective November 1, 2014 ..............$ 0.55 per hour
>
> Effective November 1, 2015 ..............$ 0.55 per hour

8.2     The following longevity wage scale applies for work performed at COMMERCIAL LOCATIONS.

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2011** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

**COMMERCIAL WAGE RATES PER HOUR**
**HIRED PRIOR TO NOVEMBER 1, 2011**

| Effective | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|---|---|---|---|---|---|---|
| 11/1/2011 | $11.05 | $11.80 | $12.55 | $13.30 | $14.70 | $16.70 |
| 11/1/2012 | | $12.35 | $13.10 | $13.85 | $15.25 | $17.25 |
| 11/1/2013 | | | $13.65 | $14.40 | $15.80 | $17.80 |
| 11/1/2014 | | | | $14.95 | $16.35 | $18.35 |
| 11/1/2015 | | | | | $16.90 | $18.90 |

Employees making more than the above schedule shall still receive longevity and anniversary raises.

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2011**, shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

**COMMERCIAL WAGE RATES PER HOUR**
**HIRED ON OR AFTER NOVEMBER 1, 2011**

|            | Start   | 1 Year  | 2 Years | 3 Years | 4 Years | 5 Years |
|------------|---------|---------|---------|---------|---------|---------|
| 11/1/2011  | $9.80   |         |         |         |         |         |
| 11/1/2012  | $10.35  | $11.60  |         |         |         |         |
| 11/1/2013  | $10.90  | $12.15  | $12.90  |         |         |         |
| 11/1/2014  | $11.45  | $12.70  | $13.45  | $14.20  |         |         |
| 11/1/2015  | $12.00  | $13.25  | $14.00  | $14.75  | $15.50  | $16.90  |

Employees making more than the above schedule shall still receive longevity and anniversary raises.

**8.3** **The following longevity wage scale applies for work performed at RESIDENTIAL LOCATIONS.**

Progression schedule for employees **HIRED PRIOR TO NOVEMBER 1, 2011** shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7 and in Letter of Understanding #3, attached hereto):

**RESIDENTIAL WAGE RATES PER HOUR**
**HIRED PRIOR TO NOVEMBER 1, 2011**

| Effective | 1 Year  | 2 Years | 3 Years | 4 Years | 5 Years | Prior to 11/1/06 |
|-----------|---------|---------|---------|---------|---------|------------------|
| 11/1/2011 | $11.80  | $12.55  | $13.30  | $14.05  | $15.45  | $17.45           |
| 11/1/2012 |         | $13.10  | $13.85  | $14.60  | $16.00  | $18.00           |
| 11/1/2013 |         |         | $14.40  | $15.15  | $16.55  | $18.55           |
| 1111/2014 |         |         |         | $15.70  | $17.10  | $19.10           |
| 11/1/2015 |         |         |         |         | $17.65  | $19.65           |

Employees making more than the above schedule shall still receive longevity and anniversary raises.

Progression schedule for new employees **HIRED ON OR AFTER NOVEMBER 1, 2011**, shall be as follows (also note additional premiums set out in Sections 8.5 and 8.6 below and additional service credit provided for in Section 8.7):

### RESIDENTIAL WAGE RATES PER HOUR
### HIRED ON OR AFTER NOVEMBER 1, 2011

|  | Start | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| 11/1/2011 | $10.55 | | | | | |
| 11/1/2012 | $11.10 | $12.35 | | | | |
| 11/1/2013 | $11.65 | $12.90 | $13.65 | | | |
| 11/1/2014 | $12.20 | $13.45 | $14.20 | $14.95 | | |
| 11/1/2015 | $12.75 | $14.00 | $14.75 | $15.50 | $16.25 | $17.65 |

Employees making more than the above schedule shall still receive longevity and anniversary raises.

8.4 In applying the above wage scales, employees shall automatically receive longevity and contract anniversary increases.

8.5 Employees functioning (1) in a cashier's capacity, (2) in primarily self-service parking surface lots, (3) as customer service representatives or (4) in ground transportation shall receive twenty-five cents ($.25) per hour over the above-schedules. If applicable, such employees shall also receive the premium set forth below in Section 8.6.

8.6 Bargaining unit supervisors employed at a residential facility, including all bargaining unit supervisors employed by members of ABOMA, shall receive thirty-six cents ($ .36) per hour over the above residential schedules (Section 8.3 above). If applicable, such employees shall also receive the premium set forth in Section 8.5 above. Employer may remove the premium only if the employee is returned to his or her previous classification at the applicable contractual wage rate as if the employee had never been made a supervisor.

8.7 The Employer agrees for the purpose of determining the wage rate of its employees (see schedules above) to give credit to any employee the amount of continuous days, months, and years of service said employee acquired under collective bargaining agreements of the Union and said employees shall be paid as set forth above.

8.8 It is understood and agreed that the red-circle provisions in Sections 8.2 and 8.3 and section 27.1 shall incorporate and include any pay increase(s) granted to employees since October 31, 2011 regardless of the reason for the increase.

### ARTICLE 9
### HOLIDAYS

9.1 Regular full-time employees shall receive additional compensation for the eight (8) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay. Those employees who are scheduled and do work on any of these eight (8) holidays will receive their regular daily straight-time rate of pay in addition to

time and one-half (1 ½) per hour for all hours actually worked on said eight (8) holidays. To be entitled to holiday pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work. An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to extenuating circumstances. For the purpose of holiday pay and overtime pay on holidays, the holidays listed below will be celebrated on the calendar days they fall on:

New Year's Day

Martin Luther King, Jr.'s Birthday

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

Employee's Birthday

9.2    A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday.

9.3    Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Holiday Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

## ARTICLE 10
## MILITARY SERVICE

10.1    Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Military Selective Service Law.

## ARTICLE 11
## JURY DUTY

**11.1**  Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

## ARTICLE 12
## SICK AND PERSONAL LEAVE

**12.1**  A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to eight (8) combined sick and/or personal days per year at the employees normal rate of pay for their normal workday hours but not less than eight (8) hours pay. Effective November 1, 2015, all full time employees shall receive one (1) additional sick and/or personal day per year.

**12.2**  A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to eight (8) combined sick and/or personal days per year based upon the average weekly hours scheduled as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

Effective November 1, 2015, all part-time employees shall receive one (1) additional sick and/or personal day per year.

**12.3**  The employee shall give one week's notice to the Employer for days used for personal leave. The employee shall phone a designated phone number and, if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave. Sick leave shall be non-cumulative.

**12.4**  Sick and/or personal days shall be earned and taken on a calendar year basis. All employees who have completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days on January 1st of each year, to be used by December 31st of each year. All employees who have not completed six (6) months of employment by December 31st shall receive their full complement of sick and/or personal days upon completion of six (6) months of employment, to be used by December 31st of that year. In the event that all of the employee's earned sick and/or personal days are not taken by December 31st, the Employer shall pay the employee the value of said sick and/or personal days.

**12.5**  Employees shall receive an accounting of all their accrued sick and personal days, no less frequently than monthly.

**12.6**  A sick or personal day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

## ARTICLE 13
## FUNERAL LEAVE

**13.1**  A regular full-time employee who may lose time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days. Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law or grandparents.

**13.2**  In order to qualify for funeral pay, the employee must have worked for the Employer for six (6) months or longer.

**13.3**  Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

**13.4**  Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving and settling the affairs of the deceased.

## ARTICLE 14
## VACATIONS

**14.1**  Employees shall receive vacation in accordance with the following schedule:

After one (1) year of employment, one (1) weeks vacation

After two (2) years of employment, two (2) weeks vacation

After five (5) years of employment, three (3) weeks vacation

After ten (10) years of employment, four (4) weeks vacation

After twenty-five (25) years of employment, five (5) weeks vacation

**14.2**

(a)  A vacation bank shall be established for each employee. The Employer shall deposit the amount of all vacation time that is owed to the employee. In addition, employees shall begin to accrue vacation on a monthly basis in accordance with (b), which shall be added to this vacation bank.

(b)  Vacations shall be earned on a monthly basis in accordance with the following schedule:

After one (1) year of employment: .417 vacation days per month (equivalent to one (1) weeks vacation):

Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 23rd month of employment), employees accrue .417 vacation days per month.

After two (2) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):

Beginning with the month in which the employee completes two (2) years of employment and continuing through the month prior to the month in which the employee completes five (5) years of employment (24th month through 59th month of employment), employees accrue .834 vacation days per month.

<u>After five (5) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation):</u>

Beginning with the month in which the employee completes five (5) years of employment and continuing through the month prior to the month in which the employee completes ten (10) years of employment (60th month through 119 month), employees accrue 1.25 vacation days per month.

<u>After ten (10) years of employment, 1.67 vacation days per month (equivalent to four (4) weeks vacation):</u>

Beginning with the month in which the employee completes ten (10) years of employment and continuing each month (120th month and continuing each month until November 1, 2008), employees accrue 1.67 vacation days per month; effective November 1, 2008, employees continue to accrue 1.67 vacation days per month until the month prior to the month in which the employee completes twenty-five (25) years of employment (120th month through 299th month).

<u>Effective November 1, 2008, after twenty-five (25) years of employment, 2.084 vacation days per month (equivalent to five (5) weeks vacation):</u>

Beginning with the month in which the employee completes twenty-five (25) years of employment and continuing for each month thereafter (300th month and beyond), employees accrue 2.084 vacation days per month.

(c)   The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d)   Employees shall be entitled to use vacation time immediately after accruing.

(e)   Every December 1st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f)   Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

**14.3**   Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

**14.4**   Employees shall be paid their earned vacation pay prior to the time they leave on vacation.

**14.5**   Preference by seniority shall be given to an employee's choice of vacation period.

**14.6**   Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (vacation, personal days, holidays, sick days, funeral leave pay) shall be considered as hours worked in determining compensation. Employees shall also accrue vacation while on Workers' Compensation.

**14.7**   Vacation checks shall be issued separately.

**14.8**   A vacation day for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement.

## ARTICLE 15
### LEAVE OF ABSENCE

15.1    The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

    (a)    The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

    (b)    The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

    (c)    Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2    The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3    The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law.

15.4    In all cases of medical leave, regardless of whether they are FMLA leaves, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5    Upon expiration of an authorized medical or family leave, an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

## ARTICLE 16
### HOURS OF WORK

16.1    Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2    Part-time employees covered by this Agreement who are called to work shall receive not less than four (4) hours work or its equivalent per day.

16.3    There shall be no split shift assignments for employees within a twenty-four (24) hour period covered by this Agreement.

16.4    Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause. However, an employee before leaving the Employer's premises shall be required to punch out.

16.5    All regular full-time employees covered by this Agreement shall be guaranteed a workweek consisting of forty (40) hours exclusive of one-half (1/2) hour for a lunch period each day. Said

workweek shall contain two (2) consecutive days off where possible for the Employer to so operate. For employees employed at residential locations only, time and one-half (1 ½) shall be paid for all hours worked over eight (8) hours daily. For all employees, time and one- half (1 ½) shall be paid for all hours worked over forty (40) hours in any one (1) week exclusive of the thirty (30) minute lunch period each day. Overtime shall not be paid twice for the same hours worked.

16.6  If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act and at least thirty (30) minutes shall be allowed each day without pay for employees' lunch period.

16.7  When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.

## ARTICLE 17
## LIMITATIONS ON PART TIME EMPLOYEES

17.1  No Employer shall have more than forty-two percent (42%) of total employees covered under this Agreement as part time employees.

## ARTICLE 18
## TRANSFERS

18.1  Transfers may not be made except for good cause or by agreement between the Employer and the Union subject to recourse through the grievance procedure. In emergency situations, however, an employee may be required to work at a different location for one (1) day.

## ARTICLE 19
## DRIVER'S LICENSE

19.1  All employees shall continuously have and shall exhibit to the Employer upon request an unrestricted State Driver's License if necessary to perform his or her job. Any employee found not to have same in his or her possession will be suspended for up to thirty (30) days until a valid license is presented. After that time, the employee may be subject to termination. The Employer has the right to run MVR checks and terminate/not hire based only upon lack of valid license.

## ARTICLE 20
## HEALTH AND WELFARE, PENSION AND LEGAL AND EDUCATIONAL ASSISTANCE

20.1  Health and Welfare

(a)  The Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2011 ..........................................$722.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)  The Employer shall contribute monthly to Teamsters Local Union No. 727 Health and Welfare Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1 , 2011 ........................................$4.15 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)    Contributions due hereunder to the Health and Welfare Fund for all employees shall commence with the month in which their employment begins; provided, however, that contributions to the Health and Welfare Fund on account of newly hired employees shall commence at the latest possible time, permitted by law, not to exceed their seventh (7th) month of employment. For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Health and Welfare Fund within the six (6) months prior to hire.

**20.2**    Pension

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Pension fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2011 ..........................................$345.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Pension Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2011 ..........................................$2.00 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)    Contributions due hereunder to the Pension Fund for all employees shall commence with the month succeeding that month in which employment begins; provided, however, that contributions to the Pension Fund on account of newly hired employees shall commence with their thirteenth (13th ) month of employment. For purposes of this Section, a newly hired employee is defined as an employee hired on or after November 1, 2006 for which no contributions were received by the Pension Fund within the six (6) months prior to hire.

**20.3**    Legal and Educational Assistance

(a)    The Employer shall contribute to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each regular full-time employee covered by this Agreement the following:

Commencing November 1, 2011 ..........................................$68.00 per month

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(b)    The Employer shall contribute monthly to Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each part-time employee covered by this Agreement the following:

Commencing November 1, 2011 ..........................................$ .40 per hour

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the provisions of Article 20, Section 20.4 below.

(c)    Contributions due hereunder to the Legal and Educational Assistance Fund for all employees shall commence with the month in which employment begins.

20.4    The contribution rates payable to the Health and Welfare, Pension and Legal and Educational Assistance Funds pursuant to Sections 20.1, 20.2 and 20.3 above shall be increased as follows:

(a)    It is agreed that the Employer shall contribute additional amounts over and above those required in Sections 20.1(a), 20.2(a) and 20.3(a) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds, combined, on behalf of each full time employee as follows:

Effective 3/1/2012.............$74.00 per month
Effective 3/1/2013............$79.00 per month (total increase of $153.00 per month)
Effective 3/1/2014............$84.00 per month (total increase of $237.00 per month)
Effective 3/1/2015.............$89.00 per month (total increase of $326.00 per month)
Effective 3/1/2016............$95.00 per month (total increase of $421.00 per month)

(b)    The distribution of the additional contributions required in (a) above to the Health and Welfare, Pension, and/or Legal and Educational Assistance Funds shall be left to the decision of the Board of Trustees of the respective Funds.

(c)    It is further agreed that the Employer shall contribute an equivalent additional hourly amount over and above those required in Sections 20.1(b), 20.2(b) and 20.3(b) to the Health and Welfare, Pension and/or Legal and Educational Assistance Funds on behalf of part time employees.

20.5    For the purpose of contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds only, any part-time employee who works one hundred twenty eight(128) hours or more in a calendar month shall be considered a regular full-time employee and full-time employee contributions will be required for that month.

20.6    Part time per hour contributions to the Health and Welfare, Pension and Legal and Educational Assistance Funds are due only up to the amount of the applicable full time contribution.

20.7    No contributions to the Health and Welfare, Pension und Legal and Educational Assistance Funds shall be required on behalf of any employee who is on a leave of absence, except as required by law.

20.8    By the execution of this Agreement, each Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

20.9    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare, Pension or Legal and Educational Assistance Funds created under this Agreement; in accordance with the rules and regulations of the Trustees of such Funds, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

**20.10** Should the Trustees of the Health and Welfare, Pension or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed three (3) years from the date of notice of audit.

**ARTICLE 21**
**MANAGEMENT RIGHTS**

**21.1** All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement.

**ARTICLE 22**
**DOCTORS' EXAMINATIONS**

**22.1** All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

**ARTICLE 23**
**TIME RECORDS**

**23.1** The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

**ARTICLE 24**
**ACCESS TO FACILITY**

**24.1** Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's working schedule.

**ARTICLE 25**
**SHIFT CHANGES**

**25.1** If the Employer has legitimate cause, it may change shifts provided that it provides employees with the required advance notice. Employees must receive seven (7) days notice of a shift change.

**ARTICLE 26**
**PAYDAY**

**26.1** Payday shall be at least as often as biweekly (every two weeks). Employees must receive a paper or electronic paycheck; an Employer is prohibited from paying an employee in cash.

**ARTICLE 27**
**MAINTENANCE OF BENEFITS**

**27.1** Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement or during the term of this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 28
## INDIVIDUAL AGREEMENTS

**28.1**   There shall be no side deals or agreements whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
## NON-DISCRIMINATION

**29.1**   It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, membership or non-membership in the Union, or any protected category.

## ARTICLE 30
## PENSION - UNFUNDED LIABILITY

**30.1**   Upon the request in writing from any Employer signatory hereto, addressed to the Benefit Funds, the Benefit Funds shall be required to furnish such Employer an annual statement for the most recent period available on the Employer's withdrawal liability, if any. It is agreed that such requests shall be limited to one (1) each year from each Employer.

## ARTICLE 31
## SHORTAGES

**31.1**   Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

**31.2**   Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred. Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

**31.3**   In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE YEAR | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |

| | |
|---|---|
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

**31.4**  It is understood that the foregoing constitute agreed-upon disciplinary guidelines. However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review. Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

**31.5**  If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

**ARTICLE 32**
**EMPLOYEE LIABILITY**

**32.1**  Except as provided for in Article 31, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

**32.2**  No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

**ARTICLE 33**
**CHANGE IN OWNERSHIP OR MANAGEMENT**

**33.1**  In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice, on the form provided by the Union, prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss. At the time of location change, the former Employer shall pay out all wages and benefits owned under this Agreement, including accrued vacation, to all former employees, unless the former Employer operates a residential location with a "pass through" contractual provision.

**33.2**  Any employee who has continuously worked at a location for one hundred and eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. The Employer losing the location will be obligated to retain all other employees. Provided, however, that regardless of length at location, the Employer losing the location shall retain any employee who was previously terminated by the acquiring Employer, if such termination was upheld through the Grievance and Arbitration Procedure, or the Union decided not to pursue such termination through the Grievance and Arbitration Procedure.

**33.3**  Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the value of all accrued vacation, accrued sick/personal days and compensation earned under this Agreement but not taken and/or paid. In addition, the Employer who lost the location shall pay the respective Benefit Funds any amounts owed. The acquiring Employer shall provide said employees with corresponding time-off without pay which the employee may use by December 31st. Upon commencing employment with

the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

## ARTICLE 34
## CREDIT UNION

**34.1**    The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit. The employee will notify the Employer by written authorization of his or her desire. Such deduction will be on a biweekly basis and forwarded to the credit union.

## ARTICLE 35
## DRIVE AUTHORIZATION AND DEDUCTION

**35.1**    The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck on a biweekly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck.

## ARTICLE 36
## OPEN FULL-TIME POSITIONS

**36.1**    Any full-time positions that become open must be offered to part-time employees at that location as follows:

(a)    Only part time employees who work at the location in which the full time position is available must be offered the position.

(b)    These part time employees are to be offered the position in seniority order, starting with the part time employee with the most seniority.

(c)    Such seniority is not length of time at the location, but rather Union seniority, as defined in Article 4, Section 4.1.

## ARTICLE 37
## LABOR MANAGEMENT COMMITTEE

**37.1**    The Employer agrees to contribute four dollars ($4.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 38
## LOCATION/FACILITY CLASSIFICATION

**38.1**    The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to valet service locations. All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location/facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

(a) Commercial: All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking spaces in the building where the location exists.

(b) Residential: All locations of employer members of ABOMA and all other locations in which more than fifty percent (50%) of the vehicles parked at the location belong to residents of the property are residential locations.

(c) Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

38.2 The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

38.3 Employees are permitted to work at multiple locations/facilities. While performing such work, employees shall be compensated for all hours worked at the location/facility under the Agreement covering that location/facility; provided, however, that where an Employer transfers an employee to another location/facility under the provisions of Article 18, such employee shall be paid the highest wage rate in effect under any of the Agreements the employee works under.

## ARTICLE 39
## TEAMSTERS-NATIONAL 401(K) SAVINGS PLAN

39.1 The Employer hereby agrees to participate in the Teamsters-National 401(k) Savings Plan ("the Plan") on behalf of all employees represented for purposes of collective bargaining under this Agreement. The Employer will make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. The Employer will forward withheld sums to the Plan at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust (the "Trust"). The Employer will execute a Participation Agreement with the Union and the Trustees of the Plan evidencing employer participation the Plan effective prior to any employee deferral being received by the Plan. In addition, the Employer agrees to require the payroll system provide separate paycheck deductions so that the Plan may allow participant loans. The Employer further agrees, at such times as it is administratively feasible, to require the payroll system to provide separate paycheck deductions so that the Plan may allow after-tax contributions.

## ARTICLE 40
## MISCELLANEOUS

40.1 Once employed, no employee shall be required to take a polygraph, behavioral analysis, background check or other similar test.

40.2 Employees, except for porters, may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers as well as office and employee restroom areas.

40.3 An employee may not be discharged or disciplined because his/her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

**40.4**   Past practices regarding car washing will prevail at each location, except that an agreement must be reached with the Union regarding the wages, hours, terms and conditions of employment for such work in any one of the following circumstances:

    (a)   where the method of washing cars or the number of cars to be washed per shift or otherwise is to be substantially changed;

    (b)   instituting car washing at any location where cars have not been washed during the past twelve (12) months; or

    (c)   instituting car washing at new garages.

**40.5**   Drug and alcohol testing will only be permitted for probationary employees and reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union. An Employer acquiring a location pursuant to Article 33 (Change in Ownership or Management) shall have the right to perform one (1) Drug and Alcohol or Background test pursuant to the existing policy and practices within the acquiring employer's first thirty (30) days of employing acquired employee. Under these circumstances, an acquired employee's refusal to submit to the Drug and Alcohol or Background test shall result in termination of employment. Positive test results from the Drug and Alcohol test under these circumstances shall be handled in accordance with the terms of the existing policy and practices. An acquiring Employer may refuse to employ an individual whose Background test under such circumstances reports the conviction of a Class 3 (or more serious) Felony. If the background check results in the refusal to employ the employee, the former employer is under no obligation to retain the employee, provided that the former employer can establish just cause that it would not have otherwise retained the employee due to a violation of company policy to disclose a class 3 (or more serious) Felony.

**40.6**   The Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests an exception to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union. Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

**40.7**   Members of ABOMA other than those listed in Schedule A who elect to adopt this Agreement shall notify ABOMA to that effect. Notice of election to adopt this Agreement shall be made by members of ABOMA in writing and ABOMA shall in turn notify the Union. Such notice shall state the name, and location of the building to which the election applies and the name of the Employer. If any building which is paying its employees who are covered by this Agreement wages higher than those provided in this Agreement shall desire to adopt this Agreement, it shall not reduce such higher wages during the term of this Agreement.

**40.8**   On the next scheduled pay period after separation of employment, an employee shall be paid all compensation owed including wages, accrued vacation days, and accrued sick/personal days, and applicable contributions will be made to the Teamsters Local 727 Health and Welfare, Pension and Legal and Educational Assistance Funds.

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors, and assigns.

THIS AGREEMENT shall be constructed as divisible as to each Employer and the failure of any Employer to abide by the terms hereof shall not operate to terminate this Agreement as to any other Employer. No breach of this Agreement by any Employer shall operate to subject ABOMA or another Employer to any legal liability to the Union.

THIS AGREEMENT shall go into effect November 1, 2011, and shall continue in full force and effect until and including October 31, 2016, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to October 31, 2016, or sixty (60) days prior to October 31 of any subsequent year. Employer agrees that the Chicago Parking Association or ABOMA shall bargain any successor Agreement on the Employer's behalf unless Employer provides written notice otherwise to the Union, the Chicago Parking Association, and ABOMA sent via certified mail sixty (60) days prior to October 31,2016, or sixty (60) days prior to October 31 of any subsequent year should this Agreement be extended.

THIS AGREEMENT is made in duplicate and each copy is an original.

EXECUTED at Chicago, Illinois, this 12th day of ___MAY_____, 2015.

FOR THE EMPLOYER:                    FOR THE UNION:

_____              _____

## LETTER OF UNDERSTANDING #1

For River North Car Wash only, it is agreed that due to inclement weather or other business reasons, full-time employees may receive less than forty (40) hours a week. Such discretion shall not be exercised unreasonably by River North Car Wash, shall be subject to the grievance procedure outlined in Article 6 of the Collective Bargaining Agreement, and shall affect only employees whose job duties are to wash cars and other related duties.

FOR RIVER NORTH CAR WASH:                     FOR THE UNION:


_____            _____

## LETTER OF UNDERSTANDING  #2

   This Letter of Understanding is entered into between Hotel Employers and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016.

   The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first 3 months (January, February and March) of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1.   To be involuntarily furloughed for up to three (3) weeks(one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this 3 month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2.   To have a full time schedule reduced to 32 hours.

   EXECUTED at Chicago, Illinois, this ___12ᵗʰ___ day of ___MAY___, 2015.

FOR THE EMPLOYER:       FOR THE UNION:

_____      _____

## LETTER OF UNDERSTANDING  #3

This Letter of Understanding is entered into between the Employer and Teamsters Local 727, and is hereby attached to and incorporated into the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016 ("the CBA").

Beginning with an Eligible Employee's (as defined herein) anniversary date, which occurs next following November 1, 2014, the parties agree that, in addition to the wage increases provided in Article 8 of the CBA, Employees who were hired between November 1, 2006 and October 31, 2011, ("Eligible Employees") will receive an additional increase of $0.30 per hour effective on their respective date of hire ("anniversary date") each year between November 1, 2014 through October 31,2020. The Eligible Employee shall receive a final increase under this Side Letter of Agreement  #3 of $0.20 in the next contract year (November 1, 2020 through October 31, 2021) An Eligible Employee shall accumulate wage increases under this Side Letter of Agreement  #3 totaling $2.00 per hour.  Employees hired between November 1, 2006 and October 31, 2011 who received a $2.00 increase during the period November 1, 2011 to April 6, 2015 or who are otherwise receiving the Top-Pay Scale, as described in Article 8 of the CBA are not eligible for increases under this Side Letter #3.

The wage increases required by this Side Letter #3 shall be retroactive to November 1, 2014 for only those Eligible Employees whose anniversary date occurred between November 1, 2014 and the date of execution of this Side Letter #3.  This Side Letter of Agreement shall survive the expiration of the CBA until the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder, unless, it is deleted through the collective bargaining process. Notwithstanding the foregoing, this Side Letter of Agreement #3, will cease to exist and will be deleted from any further Collective Bargaining Agreement upon the accumulation of a total of $2.00 per hour in increases by the last of employees eligible to receive increases hereunder.

EXECUTED at Chicago, Illinois, this _____ 12th _____ day of ___ MAY ___, 2015

FOR THE EMPLOYER:

FOR THE UNION:

## LETTER OF UNDERSTANDING #4

This Letter of Understanding is entered into between the Employer and Teamsters Local 727, and is hereby attached to and incorporated into the parties' collective bargaining agreement that is in effect from November 1, 2011 through October 31, 2016 ("the CBA"). This Side Letter of Agreement, however, will not be part of the Commercial Agreement which the Union distributes to the other operators or owners which employ employees subject to the terms of the Commercial Agreement. To the contrary the Union agrees it will not distribute, nor disclose the existence of, this Side Letter of Agreement except in response to a lawful request to which the Union is legally obligated to respond or order of court.

The parties agree that in the event an employer listed in Attachment 1 to this Side Letter #4 claims the execution of the CBA triggers the operation of the most favored nation clause (if any) contained in a collective bargaining agreement it signed because its obligation under its collective bargaining agreement to pay wages to its employees hired between November 1, 2006 and October 31, 2011 is greater than those provided in the CBA, claims that it is entitled to a monetary award against the Union, and prevails upon such claims, then the Union shall be entitled to a prorated indemnification of its liability (if any) by the operators listed herein in the following amounts: Standard Parking thirty-five per cent (35)%, Interpark LLC eight per cent (8)%, Impark LLC eleven per cent (11)%, LAZ Parking Chicago, LLC twenty per cent (20)%, and ABM Parking twenty six per cent (26)%.

The parties also agree that in the event an employee employed by an employer listed in Attachment 1 to this Side Letter #4 suffers a reduction of pay because his/her employer claims the execution of the CBA triggers the operation of the most favored nation clause (if any) contained in its collective bargaining agreement because its obligation under its collective bargaining agreement to pay wages to its employees hired between November 1, 2006 and October 31, 2011 is greater than those provided in the CBA and that he/she is entitled to a monetary award and does not prevail upon such claims before a neutral arbitrator, then the employee shall be entitled to a restoration of the level of wages before his/her employer acted. The liability for the amount of the restored wage shall be prorated amongst the operators listed herein in the following amounts: Standard Parking thirty-five per cent (35)%, Interpark LLC eight per cent (8)%, Impark LLC eleven per cent (11)%, LAZ Parking Chicago, LLC twenty per cent (20)%, and ABM Parking twenty six per cent (26)%. (An employee who prevails before a neutral arbitrator shall have no rights under this Side Letter #4 as his/her wage(s) are due and owing from his/her employer).

The operators listed herein shall also be responsible for reimbursing the Union for the costs of any arbitration described in this Side Letter #4 prorated in the following amounts : Standard Parking thirty-five per cent (35)%, Interpark LLC eight per cent (8)%, Impark LLC eleven per cent (11)%, LAZ Parking Chicago, LLC twenty per cent (20)%, and ABM Parking twenty six per cent (26)%..

EXECUTED at Chicago, Illinois, this _____12ᵗʰ_____ day of ___MAY___, 2015

FOR THE EMPLOYER:

_signature_

FOR THE UNION:

_signature_

| | LETTER OF UNDERSTANDING #4--ATTACHMENT 1 |
|---|---|
| 1 | 1 E SCHILLER |
| 2 | 1355 N SANDBURG/CHICAGOLAND MANAGEMENT |
| 3 | 1616 CONDOMINIUM ASSOCIATION |
| 4 | 200 E. DELAWARE CONDOMINIUM ASSOCIATION, INC. |
| 5 | 2400 LAKEVIEW CONDOMINIUM ASSOCIATION |
| 6 | 2909 N SHERIDAN RD/TOWN MANAGEMENT |
| 7 | 2930 BUILDING GARAGE |
| 8 | 3150 LAKE SHORE DRIVE |
| 9 | 33 EAST CEDAR |
| 10 | 360 WELLINGTON (KANE MANAGEMENT) |
| 11 | 3900 LAKE SHORE CONDOMINIUM ASSOCIATION |
| 12 | 850 INVESTORS LLC. |
| 13 | 88 WEST SCHILLER/LOWELL BUILDING |
| 14 | A & R JANITORIAL SERVICE, INC. |
| 15 | A.K.A. PARKING, INC. |
| 16 | ABM Janitorial |
| 17 | ABOMA |
| 18 | ADDIS PARKING AND VALET |
| 19 | AMERICAN PARKING, LLC |
| 20 | CAR SHINE |
| 21 | CHICAGO PARKING VALET, LLC |
| 22 | DIRECT EMPLOYEE PAYMENT CO. |
| 23 | ENCORE HOSPITALITY SERVICES |
| 24 | GERALEX, INC |
| 25 | HYATT REGENCY CHICAGO |
| 26 | J.C.'S UNITED BUILDING MAINTENANCE, INC. |
| 27 | LAKE POINT TOWERS GARAGE AND CONDOMINIUM ASSOCIATION |
| 28 | LEGACY PARKING COMPANY, LLC |
| 29 | MILLENNIUM PARK LIVING, INC. |
| 30 | ONE PARKING |
| 31 | PARK USA, INC. |
| 32 | PAS, LLC |
| 33 | RIVER NORTH CAR WASH |
| 34 | SALSTAR MANAGEMENT INC. |
| 35 | SHINE CARE SERVICE, INC. |
| 36 | SMITH MAINTENANCE COMPANY |
| 37 | SUPERIOR ENTERPRISE SOLUTIONS (FKA 1420 Sheridan) |
| 38 | UGL UNICCO |
| 39 | USA PARKING, LCC |
| 40 | VALET PARKING AUTHORITY, LTD. |
| 41 | VARGAS GROUP, LLC |
| 42 | VPS of ILLINOIS LLC |
| 43 | VPS PARKING MANAGEMENT, LLC FKA VPS of ILLINOIS LLC 25 OHIO |

44  WE'RE CLEANING